IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| NADINE M. STRAMAGLIO, | ) | Case No. 09 C 50040 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Magistrate Judge |
| | ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### I.        Introduction

Nadine Stramaglio seeks judicial review of the Social Security Administration

Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB")  and

Supplemental Security Income ("SSI") under Title II of the Social Security Act.  *See* 42 U.S.C. §

405(g).  This matter is before the magistrate judge pursuant to the consent of both parties, filed

on June 19, 2009.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

### II.        Administrative Proceedings

Claimant first filed for DIB and SSI on or about November 17, 2005.  (Tr. 53, 110.)  She

alleged a disability onset date of May 1, 2004.  (Tr. 114, 540.)  This was later amended at

Claimant's hearing to allege an onset date of October 1, 2006.  (Tr. 53.)  Her claim was denied

initially and on reconsideration.  (Tr. 1, 46-49.)  The Administrative Law Judge ("ALJ")

conducted hearings into Claimant's application for benefits on December 12, 2007 (Tr. 9.)  At

the hearing, Claimant was represented by counsel, Steven McCarty, and testified.  (Tr. 33–45.)

1

Susan Entenberg, a Vocational Expert (hereinafter referred to as "VE"), was also present and testified. (Tr. 32–45.) The ALJ issued a written decision denying Claimant's application on February 26, 2008, finding that Claimant was not disabled because there were jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 63–64.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, that decision constitutes the final decision of the Commissioner. (Tr. 1–3.)

## III.    Background

According to testimony, Claimant was 40 years old at the time of her hearing. (Tr. 16.) She lives with her two teenage sons. (Tr. 27.) She completed schooling through the eleventh grade. (Tr. 16.)

Claimant testified that she was feeling very down and depressed in the weeks leading up to her hearing. (Tr. 18.) She is not good at concentrating, but was able to drive herself to the hearing. (Tr. 22.) She did not feel she would be able to do any type of job because she would begin to feel down or start having a panic attack and would not go in to work. (Tr. 19.) Her doctor wanted her in an inpatient program, but because she has to take care of her kids she was in an outpatient program at the hospital. (Tr. 19.) She was seeing a psychologist, Dr. Anwar, who proscribed her approximately five medications, including Xanax, Adderall, a Prozac-like medication, and a mood stabilizer. (20-21.) Claimant indicated that her doctors were leaning toward diagnosing her with bipolar symptoms, and she was put on Klonopin as a result. (Tr. 25.) She also stated that she has panic attacks three times a week, and they are brought on by driving or trying to get things accomplished. (Tr. 27–28.) When she has a panic attack, she's okay once she takes Xanax, but feels down again when it wears off. (Tr. 28.) From the point she senses a

panic attack coming on to the time she can return to what she was doing lasts more than thirty minutes. (Tr. 29.) She had been having this pattern for three years prior to her hearing, and testified that it had gotten worse in the last couple years. (Tr. 29.)

Her daily activities include sleeping a lot and doing basic household chores like dishes or picking up the house. (Tr. 23.) Doing the basic chores causes her to get tired very easily, and on bad days she just takes medication and sleeps. (Tr. 23.) She attends her outpatient program for six hours a day during the week and usually receives rides to and from the hospital. (Tr. 24.) Though her sons are 15 and 14 years old, her oldest still needs supervision because of his ADD. (Tr. 27.) She did not attend any of her sons' parent/teacher conferences in the past year and rarely attended any of her sons' football games. (Tr. 28.) Some days she isolates herself, and she needs to talk to someone on the phone. (Tr. 29.) She does not like to go grocery shopping and has a hard time keeping appointments. (Tr. 32.) She has not been able to maintain a relationship with anyone other than family, and she had not really talked to her family for about two years. (Tr. 32.) Even her children did not know she was in an outpatient program. (Tr. 32.)

Claimant could not recall exactly when she worked at several of her jobs in the past. (Tr. 22.) The ALJ had documents, including earnings and medical records, indicating that Claimant worked a waitress job in 2007, but Claimant denied working this job. (Tr. 12–14, 16–18, 32–33.) Claimant offered as an explanation for the 2007 employment records that she had problems with identity theft in the past. (Tr. 25.) She stated that she thought she worked as a receptionist for an attorney's office in 2005, though her counsel indicated it was in 2006, and that she was fired after the attorney learned what types of medications she was taking. (Tr. 22,

33.)  She would work from the morning until about 1:00 or 2:00 in the afternoon, depending on

what the firm needed.  (Tr. 33.)  Claimant stated that she would have a hard time recalling any

information about the eight to ten different jobs listed in her records beginning in 2007.  (Tr. 36.)

She stated that she remembered the most about a job as an assistant to one of the bosses at a door

and hardware company that she worked in 2002 and 2003.  (Tr. 36–37.)  At the assistant job, she

would enter things into the computer, do some filing, answer phones, and search the newspaper

for places that were looking to have construction done.  (Tr. 37.)  She also testified that she

worked with BFI Waste Management making collections calls, for ComEd reading electricity

meters, and at Public Aide as an office assistant, (Tr. 37–39.)

The VE testified that most of Claimant's past work was office-type work that can be

categorized as sedentary, semi-skilled.  (Tr. 40.)  The meter reader job was light, semi-skilled.

(Tr. 40.)  The waitressing job would have been light and at the low end of semi-skilled.  (Tr. 40.)

All but the meter reading job would have required communication with others.  (Tr. 40.)  The

ALJ presented the VE with a hypothetical individual with the following limitations:

> moderate limitations as far as traveling at unfamiliar places,
> moderate limitations as far as interacting with the public, moderate
> limitations as far as completing a normal workday and workweek
> without interruptions from psychologically based symptoms,
> moderate limitations in the ability to perform activities within a
> schedule, maintain regular attendance and be punctual within
> customary tolerances, maintain attention and concentration for
> extended periods and carry out very short and simple instructions

(Tr. 41.)  The VE testified that such limitations are inconsistent with competitive work.  (Tr. 41.)

The ALJ then posed an additional hypothetical to the VE for an individual with the following

abilities:

> capable of at least understanding, remembering, carrying out

> simple instructions and appropriately adapting to routine
> workplace changes such that they could do work that's unskilled,
> routine, learnable on short demonstrations, does not involve
> extended contact or interaction with others.

(Tr. 42.) The VE stated that such a person would be capable of working jobs such as

housekeeper, dishwasher, and packer. (Tr. 42.) The VE indicated that there were approximately

22,000 light housekeeping jobs, 15,000 dishwashing jobs, and 20,000 packer jobs in the Chicago

metropolitan area. (Tr. 42.) The VE testified that if anything were to interfere with an

individual's ability to reliably keep a schedule, to avoid taking frequent unscheduled breaks or

absences, to make few mistakes and complete tasks as assigned, or to display appropriate work

behavior, that individual would be incapable of competitive work. (Tr. 43.) According to the

VE, a person needs to be productive 90 percent of the time at his or her job. (Tr. 43.)

The court notes that approximately two months after Claimant's hearing, the ALJ was

able to secure additional evidence concerning Claimant's work as a waitress in 2007. (Tr.

120–121, 218.) Claimant responded through counsel that she worked at an IHOP restaurant as a

waitress through June or July of 2007. (Tr. 221.)

## IV.     Medical Evidence

Claimant's medical treatment records begin with treatment notes from Dr. Syed Anwar,

M.D., dating back to October 23, 1997. (Tr. 231.) Dr. Anwar's notes reflect that he discussed

Claimant's marital problems, divorce, anger, increased agitation, and trying to increase

Claimant's self esteem at appointments on October 25, 1997, November 8, 1997, November 25,

1997, and December 3, 1997. (Tr. 231.) Notes from appointments between February and May

of  2008 appear to indicate Claimant was feeling depressed, agitated, and upset as she went

through a divorce and custody battle. (Tr. 229–30.) Notes from appointments on June 15, 1998

5

and November 9, 1998 are difficult to discern but contain notes that Claimant was continuing to take Prozac and had ongoing issues regarding a dispute over the custody of her children.  (Tr. 241.)

Claimant did not see Dr. Anwar again until April of 2004.  (Tr. 242.)  Claimant had an appointment on May 27, 2004 where she complained of out of control stress and spoke of her boyfriend and children.  (Tr. 243.)  A Psychiatric Progress Update by Dr. Anwar from December 15, 2004 indicates that Claimant was stressed out and depressed because she had lost her job and had difficulties with her boyfriend.  (Tr. 244.)  Claimant was given a prescription for Adderall to help her focus, Xanax for her anxiety, and Dr. Anwar suggested she get on an antidepressant as well.  (Tr. 244.)  Notes from appointments on June 15, 2005 and November 10, 2005 are mostly illegible, but do contain notes as to Prozac and Adderall.  (Tr. 245.)  A Medication Record spanning the period from May 2004 to November 2005 indicate that Claimant was regularly given prescriptions for Adderall and Xanax, and occasionally Prozac.  (Tr. 233–34.)

On April 11, 2006, John Peggau, Psy. D., performed a consultative psychological evaluation on Claimant.  (Tr. 258.)  Claimant described her disability as panic attacks and an inability to sleep or focus.  (Tr. 258.)  Claimant reported having been in occasional therapy, but had not been in therapy recently.  (Tr. 258.)  Dr. Peggau also reviewed a daily activities report in Claimant's record that included an interview with her best friend and noted that she had been going to a therapist for four years for depression and anxiety.  (Tr. 258.)  The report also noted that Claimant was fired from her last job and "always gets fired" from jobs.  (Tr. 258.)  She described how Claimant was developing a fear of leaving her home and how she would sometimes stay home in pajamas for two or three days at a time.  (Tr. 258.)

Dr. Peggau described Claimant as having good hygiene and normal motor activity, gait, and posture. (Tr. 259.) He described her mood as euthymic and her affect as appropriate. (Tr. 259.) Claimant reported regular contact with her mother and two of her siblings. (Tr. 259.) Claimant also described her work history, which included numerous jobs that she held for various lengths of time. (Tr. 259.) Dr. Peggau noted that Claimant's typical day began around 3:00 a.m. or 4:00 a.m. with coffee and cigarettes, followed by getting her kids up and running them around, then mostly laying in bed all day. (Tr. 259.) She described how she has no other friends outside of her best friend. (Tr. 259.) Claimant stated that she does all of the laundry, grocery shopping, cooking, and cleaning. (Tr. 259.)

After conducting a number of tests and examination techniques with Claimant, Dr. Peggau diagnosed Claimant with Dysthymia and a GAF score of 80. (Tr. 260–61.) Dr. Peggau found that the Claimant was able to understand, remember, sustain concentration and persist in tasks. (Tr. 261.) He also noted that Claimant is able to interact socially and adapt to work settings. (Tr. 261.)

On April 15, 2006, Kamlesh Ramchandani, M.D., performed a consultative physical evaluation on Claimant. (Tr. 262.) Claimant described panic attacks that occurred about three times per week and led to chest pains, palpitations, shaking with rapid breath, nausea, and headache. (Tr. 262.) Claimant stated that she is able to obtain relief through medication and rest. (Tr. 262.) Dr. Ramchandani diagnosed Claimant with anxiety neurosis with depression, stress headaches, and "tobaccoism." (Tr. 263.)

In May of 2006, Joseph Cools, Ph.D., a state agency reviewing psychologist, reviewed Claimant's records and filled out a Psychiatric Review Technique form for the Social Security

Administration.  (Tr. 264.)  Dr. Cools indicated that a Residual Functional Capacity Assessment ("RFC") was required based upon the finding that Claimant had impairments of Dysthymic Disorder, an anxiety-related disorder in the form of recurrent severe panic attacks, and/or substance addiction disorders.  (Tr. 264, 266–68.)  Dr. Cools then filled out a Mental RFC Assessment form for the Administration.  (Tr. 271.)  Dr. Cools found Claimant was not significantly limited in her ability to do the following:  understand and remember very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without becoming distracted; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  (Tr. 271-72.)  Dr. Cools indicated that Claimant was moderately limited in her ability to:  carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; complete a normal work day or week without interruptions from psychologically based symptoms; interact appropriately with the general public; and travel in unfamiliar places or use public transportation.  (Tr. 271-72.)  Claimant was listed as being markedly limited in the ability to understand and remember detailed instructions and the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 271.)

In his explanation for his assessment, Dr. Cools' described Claimant's medical history.  (Tr. 273.)  He noted that the consultative examiner's diagnosis of dysthymia with a GAF score of

80 was not consistent with a person who was having three panic attacks per week that would incapacitate her for two hours each. (Tr. 273.) Dr. Cools noted that Claimant's treating notes were more restrictive than her psychological evaluation, but not as restricted as the Claimant self-reports. (Tr. 273.) He diagnosed Claimant with a severe mental impairment characterized by depression and anxiety, and noted that she received a good result from her medications. (Tr. 273.) She was not found to meet or equal any impairment in the Listings. (Tr. 273.) Ultimately, Dr. Cools found that Claimant retained the capacity to understand, learn, and remember simple routine tasks; the capacity to maintain concentration, pace, and persistence sufficient to perform simple routine tasks; the ability to relate adaptively to others; and the capacity to perform simple routine tasks with a regular schedule with adequate pace and endurance. (Tr. 273.) The mental RFC assessment of Dr. Cools was affirmed by adjudicator David Lindberg on September 6, 2006. (Tr. 286.)

Claimant saw Dr. Anwar on July 20, 2006. (Tr. 264.) Although the notes from the appointment are largely illegible, it appears Dr. Anwar added Trazodone[1] to Claimant's prescriptions. On February 19, 2007, Claimant saw Dr. Anwar for a follow-up visit where she reported difficulty sleeping and that she felt her medications had been working for a while, but were no longer working. (Tr. 248.) Dr. Anwar noted that Claimant's mood was good, her affect appropriate, her anxiety moderate, her psychosis stable, her behavior was relaxed and comfortable, and her thoughts focused. (Tr. 248.)

On June 21, 2007, Claimant was seen at clinic affiliated with the University of Illinois

---

[1]Trazodone is a serotonin modulator used to treat depression. PubMed Health, Trazodone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (last reviewed Mar. 10, 2011).

College of Medicine for radiating back pain that was most severe between her shoulder blades. (Tr. 298.)  The notes from the visit state that Claimant was working as a waitress but had not been able to work during the pain.  (Tr. 298.)  Claimant underwent a number of diagnostic evaluations, including MRI studies and X-rays, and the assessment was that the pain was likely musculoskeletal.  (Tr. 298.)  Claimant was concerned that the pain was a side effect of medications prescribed by her psychiatrist, and her psychiatrist referred her to rule out a cardiac source of pain.  (Tr. 300.)  Claimant went through a number of tests as a follow-up to this appointment, and the findings generally did not confirm any cardiac or arterial problems.  (Tr. 313–16.)  On September 28, 2007, Claimant was seen at Swedish American Medical Center, presenting with chest pain.  (Tr. 359.)  The notes reference Claimant's prior cardiac tests and indicate that her symptoms were most likely non-cardiac chest pain. (Tr. 359.)  The pain ultimately resolved itself and Claimant was discharged.  (Tr. 359.)

The record also contains a note from December 10, 2007 from a therapist at Swedish American Hospital indicating that Claimant was presently receiving treatment for mental health reasons.  (Tr. 391.)  The note stated that Claimant was attending a partial hospitalization program from 9 a..m. to 3 p.m. daily and that it was not clear how long Claimant would be in the program. (Tr. 391.)

## V.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence.  42 U.S.C. § 405(g).  The ALJ's legal conclusions are reviewed de novo.  *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).  However, the court "may not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.     Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a

claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

**VII.   Analysis**

   **A.      Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity**

   At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

   In this case, the ALJ found that Claimant "has not engaged in substantial gainful activity since October 1, 2006, the alleged onset date of disability onset." (Tr. 55.) The ALJ did note, however, that Claimant's record appears to show that she performed activity during the interval under adjudication that was substantial and gainful. (Tr. 56.) Because Claimant was unable to provide meaningful information as to her work activity, the ALJ determined that disposition

12

would be more appropriate at a later sequential evaluation step.  (Tr. 56–57.)  Neither party disputes this determination.  As such, the ALJ's Step One determination is affirmed.

**B.      Step Two: Does the Claimant Suffer From a Severe Impairment**

Step Two requires a determination whether the claimant is suffering from a severe impairment.  A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  The claimant's age, education, and work experience are not considered in making a Step Two severity determination.  20 C.F.R. § 404.1520(c).  If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: anxiety, depression, gastroesophageal reflux disease (GERD), atypical chest pain, hyperlipidemia, obesity, 1980 right arm fracture, 1994 tubal ligation and polysubstance abuse in remission.  (Tr. 57.)  The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments, and the parties do not dispute this determination.  Therefore, the ALJ's Step Two determination is affirmed.

**C.      Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity.  20 C.F.R. § 404.1525(a).  The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry.  *Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is medically equivalent to a

listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. The ALJ found that none of Claimant's physical impairments meet or medically equal any of the listings. (Tr. 57–58.) Specifically, the ALJ noted that the evidence does not support a finding that Claimant has cardiac dysfunction consistent with section 4.00ff or gross/fine manipulative deficits consistent wtih section 1.00B.2 of the listings. (Tr. 57–58.) The ALJ's determination is supported by substantial evidence in the record, and neither party challenges this finding.

Regarding Claimant's depression, the ALJ found that "Claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 (Affective Disorders) or 12.06 (Anxiety Disorders)." (Tr. 58.) In order to find the required level of severity under Listing 12.04 and/or 12.06, either the requirements in subparts A and B, or the requirements in subpart C must be satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00. Paragraph B sets out four criteria to be used in assessing severity, and a Claimant is said to meet the requirements of the paragraph if two of the four criteria are satisfied. *Id.* Referring to the "paragraph B" criteria, the ALJ found that Claimant experiences "merely mild restriction" in her activities of daily living; "merely moderate limitations" in social functioning; "merely moderate" restrictions in concentration, persistence or pace; and no episodes of decompensation. (Tr. 58–59.) The ALJ also considered the "paragraph C" criteria, and specifically noted that it was not satisfied by Claimant's condition. (Tr. 59.) The ALJ's finding,

supported by substantial evidence in the record, clearly explains why Claimant's symptoms do not meet the requirements in Listings 12.04 or 12.06. Therefore, the ALJ's determination was appropriate as to Claimant's depression and neither party challenges this finding.

The court affirms the ALJ's Step Three determination.

### D. Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past

At Step Four, the Commissioner determines whether the claimant's residual functional capacity ("RFC") allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about her limitations. *Id*. Although medical opinions bear strongly upon the determination of RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any

measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  Soc. Sec. Rul. 96-7p; *see* 20 C.F.R. § 404.1529(c).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements.  20 C.F.R. § 404.1565(a); Soc. Sec. Rul. 82-62.  If the claimant's RFC allows her to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work, the inquiry proceeds to Step Five.

In performing the Step Four analysis, the ALJ determined Claimant's RFC to be the following:

> "the claimant retains a maximum residual functional capacity for the full range of work at all exertional levels, subject to the need for routine, unskilled tasks, learnable on short demonstration that do not require extended written or oral communication."  (Tr. 59.)

In making his RFC determination, the ALJ stated that he considered all of Claimant's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  (Tr. 59.)  The ALJ went through the two-step analysis to consider whether Claimant's medical impairments could reasonably be expected to produce the alleged symptoms, and if so, the extent to which the intensity, persistence, and limiting effects of Claimant's symptoms limit Claimant's ability to do basic work activities.  (Tr. 60.)  Where statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by medical evidence, a finding is made on the credibility of the statements based on a consideration of the entire record.  (Tr. 60.)

The ALJ found that the claimant's medically determinable impairments reasonably could

be expected to produce the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment.  (Tr. 60.)  The ALJ's discussion of Claimant's record evidenced significant consideration and understanding of the hearing testimony and Claimant's medical history.  (Tr. 60–62.)  The ALJ noted substantial evidence in the record to support his RFC determination.  Among the supporting evidence described by the ALJ, the court specifically notes the following:

- Claimant's treating psychiatrist, Dr. Anwar, noted in December 2004 (prior to the time under adjudication) that Claimant was feeling stressed due to current situations in her life, prescribed Prozac and Adderall XR, did not provide information as to an actual mental status examination, and did not anticipate seeing Claimant again for two to three months.

- At an agency requested consultative evaluation with Dr. Peggau in April 2006, Claimant acknowledged no current counseling or therapy.  Dr. Peggau found Claimant to be well-groomed with good hygiene; to have appropriate affect and euthymic mood; to have normal activity, gait, and posture; and to have audible, sustained, and intelligible speech.

- At the consultative evaluation with Dr. Peggau, Claimant exhibited an adequate fund of knowledge, was diagnosed with simple dysthymia, and was assigned a GAF score of 80, which would tend to imply very minimal restrictions in social and occupational functioning.  Claimant also stated that she did all of the laundry, shopping, cooking, and cleaning for her family.

- Also in April 2006, at a consultative evaluation with Dr. Ramchandani, an internist, Claimant was diagnosed only with stress headaches, tobaccoism, and anxiety neurosis with depression.

- In September 2007, Claimant began a smoking cessation and weight loss program at the request of a treating physician.  She advised a primary care physician that she had chest pain twice a day and was too anxious to exercise or to go to the store alone, but also referenced working as a waitress as of August, 2007.

- Claimant referenced heavy medication side effects to her weight loss coach in October 2007, but in February of 2007, Dr. Anwar expressly noted the absence of asserted medication side-effects when Claimant was on the same medications.

- In February 2007, Dr. Anwar described Claimant as relaxed, comfortable, and with moderate anxiety.  In August 2007, Claimant's primary care physician, Dr. Sapying, described Claimant's depression as stable.

- The only documentary evidence Claimant furnished as to her longitudinal functioning over the period under adjudication was a two-page handwritten letter signed by a Swedish American therapist  from December 10, 2007, indicating that Claimant initiated partial day hospitalization for "mental health reasons" and that it was not clear how long she would be in the program.

The ALJ proceeded to compare what he considered to be a vague statement of the Swedish American therapist against the observations made by the treating psychiatrist, treating primary care physician, and treating cardiologist that Claimant was "pleasant, stable, relaxed, comfortable, and working during most of the interval under adjudication."  The evidence in the medical record was not sufficient to show that Claimant would be continuously unable to work for a period of twelve continuous months.  (Tr. 62.)  The ALJ added that none of the treating personnel indicated that the Claimant was incapable of performing any type of work.  (Tr. 63.)  To the extent Claimant argues that the ALJ should have incorporated information contained in the Psychiatric Review Technique form filled out by Dr. Cools, a state agency reviewing psychologist, into the hypothetical the ALJ posed to the VE, the court will address this in its Step Five analysis.

In conjunction with the above findings, the ALJ also addressed Claimant's credibility as it relates to her claims about her symptoms.  An ALJ's determination of credibility should not be overturned by a reviewing court unless it is "patently wrong."  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).   Here, the ALJ noted that Claimant told her weight loss coach that she had several small myocardial infarcts in August 2007 and that she was experiencing heavy medication side effects, despite her cardiologist and treating physician finding that she did not

have significant cardiac issues and her psychiatrist continuing to prescribe her the same medications after noting the absence of side effects. (Tr. 61–62.) The ALJ also noted that Claimant attempted to explain at her hearing that the work activity that appears in her record from 2007 may have been the result of identity theft, when it was apparent and Claimant later recalled that she had worked as a waitress at an IHOP. (Tr. 62.) Finally, the ALJ noted that he considered Claimant's testimony that she had been involved in no relationship beyond her children for two years prior to her hearing to be an additional incidence of unreliable information because other evidence tended to indicate she had been involved in domestic conflicts. (Tr. 62.) Based on the supporting evidence referenced by the ALJ, the court does not find the credibility determination to be patently wrong or unsupported.

Combining the credibility determination with the information contained in the record and discussed in the ALJ's decision as to Claimant's medically determinable impairments, the court is not persuaded to disturb the ALJ's RFC finding. The ALJ provided a sufficient analysis such that he built a "logical bridge" between the evidence in the record and his conclusion.

After determining the Claimant's RFC, the ALJ went on to find that the Claimant was unable to perform any past relevant work. (Tr. 63.) As noted herein, the ALJ apparently had difficulty determining what work activity in Claimant's past constituted past relevant work. A review of Claimant's testimony provides sufficient justification for such difficulty, and underscores why the ALJ proceeded to Step Five. Neither party disputes the ALJ's Step Four finding, and therefore, it is affirmed.

**E.**  **Step Five: Does Any Other Work Exist in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors**

At step five, the Commissioner determines whether the Claimant's RFC and vocational factors allow the Claimant to perform any job which exists in the national economy in significant numbers. 20 C.F.R. § 404.1560(c). The burden is on the Commissioner to provide evidence demonstrating other work exists. 20 C.F.R. § 404.1560(c)(2). In doing so, the Commissioner considers the Claimant's RFC and vocational factors in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "Guidelines").

The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile. Soc. Sec. Rul. 83-11. The Guidelines represent exertional maximums, and if the Claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines and/or has non-exertional limitations, the medical-vocational rules are used as a framework for decision making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or exertional limitations. Soc. Sec. Rul. 83-12; 83-14.

If the Claimant has solely non-exertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision making. Soc. Sec. Rul. 85-15. A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy. *Overman v. Astrue*, 546 F. 3d 456, 2008 U.S. App. LEXIS 21016 at *18 (7th Cir. 2008).

Here, Claimant's RFC indicated that Claimant had no exertional limitations, but Claimant's ability to perform work at all exertional levels was compromised by non-exertional limitations. (Tr. 59, 63.) Thus, the ALJ relied on the VE's testimony to determine the extent to which Claimant's non-exertional limitations erode the occupational base of unskilled work at all

exertional levels. (Tr. 63.) Taking into consideration Claimant's age, education, work experience, and residual functional capacity, the VE testified that Claimant would be able to perform the requirements of representative occupations such as housekeepers, dishwashers, and packers. (Tr. 63.) The VE testified that there were approximately 22,000 light housekeeping jobs, 15,000 dishwashing jobs, and 20,000 packer jobs in the Chicago metropolitan area. (Tr. 42.) The ALJ found the VE's testimony to be consistent with the information contained in the Dictionary of Occupational Title, and concluded that a finding of "not disabled" is appropriate under section 204.00 of the Guidelines. (Tr. 64.)

Claimant argues the ALJ failed to include certain limitations noted in the Psychiatric Review Technique form filled out by Dr. Cools into the hypothetical the ALJ posed to the VE. This would be significant where it could be shown that the VE's testimony was reliant on incomplete or inaccurate information As noted, *supra*, Dr. Cools checked boxes on the form indicating that Claimant was not limited in certain areas, moderately limited in a number of others, and markedly limited in two areas. The checked boxes on the Psychiatric Review Technique form do not constitute a full mental RFC. Rather, that RFC assessment can be found in Dr. Cools' detailed explanation at part III of the form where he concluded that Claimant retained the capacity to understand, learn, and remember simple routine tasks; the capacity to maintain concentration, pace, and persistence sufficient to perform simple routine tasks; the ability to relate adaptively to others; and the capacity to perform simple routine tasks with a regular schedule with adequate pace and endurance. (Tr. 273.) The hypothetical posed to the VE by the ALJ ultimately described the non-exertional limitations as "capable of at least understanding, remembering, carrying out simple instructions and appropriately adapting to

routine workplace changes such that they could do work that's unskilled, routine, learnable on short demonstrations, does not involve extended contact or interaction with others." (Tr. 42.) In light of the medical evidence from both the treating and state agency physicians in the record, the ALJ's RFC and hypothetical to the VE are supported by substantial evidence.

Claimant also urges the court to remand because the ALJ did not ask the VE whether the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles. Social Security Ruling 00-4p places an affirmative responsibility on the ALJ to ask the VE if there is a potential conflict between the VE's testimony and the Dictionary of Occupational Titles. *See also, Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). The court notes that after listing the types and number of jobs available in the Chicago metropolitan area, the VE stated that her testimony was "based on the Department of Labor Occupational Employment Statistics." (Tr. 42.) Nevertheless, the Commissioner concedes that the ALJ did not ask this question of the VE at the hearing, but urges the court to find harmless error because no potential conflict has been identified. The Seventh Circuit has engaged in a harmless error analysis where a significant number of jobs that are not inconsistent with the DOT remain available to Claimant. *Coleman v. Astrue*, 269 F. Appx. 596, 602 (7th Cir. 2008); *Prochaska*, 454 F.3d at 735–36.

Claimant argues that there are conflicts and vagueness in the VE's testimony that create harmful error. The ALJ adopted the VE's testimony that there were approximately 57,000 jobs available in the Chicago metropolitan area for the representative jobs categories of housekeeping, dishwasher, and packer. Claimant argues that these job categories are broad, and that specific jobs within these categories are listed in the DOT as having a Specific Vocational

Profile ("SVP") of 2. According to Appendix C of the DOT, an SVP of 2 refers to jobs where it would take anything beyond short demonstration up to and including one month for a typical work to learn the techniques, acquire the information, and develop the facility needed for average performance. Claimant believes that the ALJ's hypothetical to the VE, which described work that was "learnable on short demonstrations" creates a conflict with the VE's testimony that Claimant can perform occupations at SVP 2 levels. No conflict was raised at the time of the hearing, and counsel for Claimant was given an opportunity to question the VE and specifically offered an opportunity to ask any additional questions.

The court does not find there to be an apparent conflict such that this case should be remanded. The vast majority of the occupations that fall under the occupations listed by the VE are SVP 1 or SVP 2 level jobs. These jobs are all considered unskilled, and are defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968. Where a Claimant has no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational based. Soc. Sec. Rul. 85-15. The ALJ considered Claimant's RFC, which is supported by substantial evidence in the record, in formulating his questions to the VE. The ALJ's hypothetical described a younger person with limited education capable of performing "work that is unskilled, routine, learnable on short demonstrations, [and] does not involve extended contact or interaction with others." (Tr. 42.) The VE was required to give citations of examples of occupation/jobs the person can do functionally and vocationally, along with the incidence of such work in the region. Soc. Sec. Rul. 85-15. After hearing the Claimant's testimony, and considering the hypothetical from the ALJ, the VE listed three categories comprising 57,000 unskilled jobs as examples of work that

would be available to Claimant.  In light of the evidence in the record as to Claimant's

capabilities and work history, and the large number of jobs identified by the VE as examples of

work that could be performed by Claimant, the court finds any error made by the ALJ during the

hearing was harmless.

**VIII.   Conclusion**

For the forgoing reasons, the Commissioner's motion for summary judgment is granted

and Claimant's motion for summary judgment is denied.

**E N T E R:**

_____
**P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**

**DATE**: March 28, 2011